In re COMMISSIONER OF PUBLIC WORKS OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. December 31, 1909.)

1. EMINENT DOMAIN (§ 238*)—PROCEEDINGS—DECISIONS REVIEWABLE.

Laws 1906, p. 1698, c. 658, § 14, amends Greater New York Charter (Laws 1901, p. 417, c. 466) § 988, as to the opening of streets and parks, providing that the city or any person affected by the proceedings and aggrieved by the order entered on motion to confirm the reports of the commissioners of estimate may appeal to the Appellate Division. Section 33 provides that the provisions of the title shall apply to all pending proceedings where the duties therein or theretofore imposed have not been performed. Laws 1894, p. 268, c. 147, authorizes a construction of the Willis Avenue bridge, and provides that the provisions of law relating to the taking of private property for public streets or places in New York City shall be applicable so far as necessary to the acquiring of the necessary land. Held, that chapter 658 governs the practice on appeal in proceedings to acquire land for such bridge, and an order denying a motion to confirm an additional and amended supplemental partial report of the commissioners of estimate as to damage to certain parcels is appealable by the city, at least where it was a final order confirming the report of the commissioners.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 238.*]

2. EMINENT DOMAIN (§ 238*)—APPEAL—SCOPE OF REVIEW—PREVIOUS ORDERS.

An order in condemnation proceedings denying a motion to confirm the report of the commissioners of estimate, and returning the report to the commissioners with instructions, is not reviewable on appeal from the subsequent report made by the commissioners; it being, when made, not final and hence not appealable, and the time when an appeal could have been taken having expired when the charter was amended, so as to permit appeals from such orders.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 238.*]

3. EMINENT DOMAIN (§ 236*)—REPORT OF COMMISSIONERS—RETURN FOR CORRECTION—RETURN TO DIFFERENT COMMISSIONERS.

Where commissioners of estimate in proceedings to acquire land for a city bridge in their report found a lump sum of damages for one parcel embracing damages to wharfage rights, a pier and land under water, if the report should be returned for a statement of damages to each item, it should be returned to the same commissioners, and not to new ones.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 236.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. EMINENT DOMAIN (§§ 234, 243*)—REPORT OF DAMAGES—LAND WITH DISPUTED TITLE.

There being a dispute as to ownership of a damage parcel, the commissioners of estimate should report its value and make an award to unknown owners, and the value thereof fixed upon confirmation will become conclusive upon all parties; the commissioners having no jurisdiction to determine questions of title.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 596, 627–629; Dec. Dig. §§ 234, 243.*]

5. EMINENT DOMAIN (§ 122*)—DAMAGES—AMOUNT OF AWARD.

In no condemnation case should an award of damages be made for less than the value of the property actually taken.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 325, 325½; Dec. Dig. § 122.*]

6. EMINENT DOMAIN (§ 145*)—DAMAGES—DEDUCTION FOR BENEFITS TO PROPERTY NOT TAKEN.

While in the outlying portions of a city where land has not been mapped and laid out in city lots, and a small strip is taken on widening a road, the whole property may be taken into consideration in estimating damages, a different rule obtains in dealing with city property divided into city lots, and where a city took a strip along an avenue front, the parcel fronting upon the avenue and an intersecting street, it was improper in computing damages to throw a street lot at the rear of the avenue lots into four avenue lots and consider the parcel as containing merely avenue lots of a greater depth; such a plan amounting to a consideration of benefits to the land not taken, which would be improper.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 378–389; Dec. Dig. § 145.*]

7. DEEDS (§ 140*)—CONSTRUCTION—EXCEPTIONS.

Where New York City granted a water lot, vacant ground, and soil under water to be made land and gained out of the Harlem river between high and low water mark, reserving so much of the land as would be necessary to make a 40-foot street on the outward part of the soil granted, the fee to the 40-foot street remained in the city whether the street was thereafter constructed or not, since a grantor who excepts a certain portion of the land conveyed, stating that it is for a certain purpose, cannot be held to have conveyed that portion because he afterwards devotes it to a different purpose.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 453, 454; Dec. Dig. § 140.*]

8. EMINENT DOMAIN (§ 84*)—RIGHT OF CITY TO IMPROVE WATER FRONT.

Where New York City granted a water lot and soil under water along the Harlem river but no wharfage or cranage rights, it could, upon subsequently obtaining land further out than the limits of the grant, extend and improve the water front for commercial purposes without compensation.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 84.*]

9. NAVIGABLE WATERS (§ 37*)—CONSTRUCTION—INTERESTS CONVEYED.

In 1808 New York City granted a water lot between high and low water mark on the Harlem river, reserving a 40-foot strip on the outward part of the soil granted for a street. Laws 1852, p. 420, c. 285, gave the city title to land under water beyond low-water mark theretofore vested in the state, including the exterior street which the city was authorized to lay out. The act provided that streets as laid out or subsequently established should be continued to the exterior street and permanent line. A map was made as required by the act showing a 70-foot exterior street, which in front of the property previously granted overlapped the outer edge of the old 40-foot strip about 3 feet. Upon the map streets and avenues were extended to the exterior street. In 1870

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the city granted a lot of land under water by metes and bounds which commenced at the original line of low water, extending outward, lying in front of the land previously granted "reserving out of the hereby granted premises so much thereof as may form part of any street," etc. The grant released the grantee from the covenants relative to the 40-foot strip in the former grant to his predecessor, "such then proposed street having been superseded." *Held*, that so much of an avenue and street extended on the map by force of the act of 1852, as lies within the 40-foot strip, was not released, but only so much of the 40-foot strip as had been superseded as a street by the new exterior street beyond it.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*]

10. EMINENT DOMAIN (§ 84*)—INTEREST OF DOCKOWNER.

The city granted to the owner of abutting land a piece of land lying between the high-water marks and the bulkhead line as established in the river in front of the upland owned by the grantee between 126th and 128th streets, reserving so much as formed any part of any street then or thereafter to be designated or laid out through the premises. Subsequently Laws 1868, p. 261, c. 150, gave the proprietors of grants of land under water in the Harlem river at a place including the land granted the right instead of building an exterior continuous bulkhead, to erect piers and wharfs therein, and excavate the slips between them. The owner by permission of the board of docks built substantial piers with bulkheads, and excavated slips between them. *Held* that while the title to land under water was vested in the city by the act of 1852 (Laws 1852, p. 420, c. 285), and was not divested by the act of 1868, but, being upon a navigable stream, was held for the same public trusts that it had been held for prior to the act of 1852 by the state, yet the grantee having built the piers, and dug out the slip by permission, he acquired property rights which could not be taken from him without compensation to his successor upon the city taking it for a bridge in no sense an aid to navigation, but rather an obstacle thereto.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 227, 228; Dec. Dig. § 84.*]

11. EMINENT DOMAIN (§ 84*)—INTEREST OF PIER OWNER.

The successor of a grantee of a water lot between high and low water mark within the section covered by Laws 1868, p. 261, c. 150, was in 1870 granted a lot under water extending from low-water mark to the harbor commissioners' bulkhead line. *Held* that, being given permission by the dock department to construct a pier as contemplated by chapter 150, the pier erected under legislative authority and by municipal permission was an existing property right, to be paid for when taken for building the bridge.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 227, 228; Dec. Dig. § 84.*]

12. EMINENT DOMAIN (§ 84*)—WHARFAGE RIGHTS.

The wharfage rights of such person being reserved to her on the outer margin of the exterior street, she was not entitled to recover therefor where such rights were not interfered with by the erection of the bridge.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 84.*]

Appeal from Special Term, New York County.

Application by the Commissioner of Public Works of the City of New York, relative to acquiring title to land for the construction of a bridge over the Harlem river. From an order denying a motion to confirm an additional and amended supplemental and separate partial report of the commissioners of estimate as to certain damage parcels, and returning the report with instructions, the city appeals. Modified.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

See, also, 111 App. Div. 285, 97 N. Y. Supp. 503, 112 App. Div. 913, 98 N. Y. Supp. 1117, and 117 N. Y. Supp. 1101.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and HOUGHTON, JJ.

Francis K. Pendleton, Corp. Counsel (John P. Dunn, of counsel, and Thomas C. Blake, on the brief), for the City.

John C. Shaw, for respondent Mary A. P. Draper.

James A. Deering, for respondents Swift.

De Forest Bros. (George Helmes, of counsel), for estate of Johnston.

CLARKE, J. This is a condemnation proceeding for the purpose of acquiring title to land upon both sides of the Harlem river required for the abutments and approaches of the Willis avenue bridge. On February 25, 1904, the Special Term made an order denying a motion to confirm the report of the commissioners of estimate and returning said report to the commissioners with instructions. An appeal was taken by the city from said order, which was dismissed upon the ground that as the law then stood, the order not being an order of confirmation, but interlocutory in its character, was not appealable. Matter of Commissioner of Public Works, 111 App. Div. 285, 97 N. Y. Supp. 503, affirmed 185 N. Y. 391, 78 N. E. 146.

Thereafter the commissioners filed a further report, and upon a motion for its confirmation the Special Term on February 11, 1908, made an order which provided:

"That the objections to said report be and the same hereby are sustained, except as to final damage parcels Nos. 16 and 16A, as to which it appears that said report is made in pursuance of and in compliance with the terms and provisions of said order of the 25th day of February, 1904; and it is further ordered, that the motion to confirm said report, except as to parcels Nos. 16 and 16A, be and the same hereby is denied; and the clerk of this court is hereby directed to return said report as to final damage parcels Nos. 12, 14 and 15 [to new commissioners, naming them] for amendment and correction, with instructions to make the same in conformity with the terms and provisions of the said order of this court dated February 25, 1904, and filed as aforesaid; and it is further ordered, that the said report of the said commissioners, in relation to final damage parcels 16 and 16A, be and the same hereby is in all respects confirmed."

The city appeals from each and every part of the said order as well as from the whole thereof, and in its notice of appeal attempts to bring up for review the order of February 25, 1904, the direct appeal from which had once been dismissed as aforesaid.

By chapter 658, p. 1684, Laws 1906, the provisions of the Greater New York Charter (Laws 1901, p. 1, c. 466), relating to the opening of streets and parks, were amended. Section 14 thereof amended section 988 of the charter so as to read:

"The city of New York or any party or person affected by the said proceeding and aggrieved by the order of the Special Term entered on the motion to confirm the said report or reports, or either of them, may appeal to the Appellate Division of the said court."

Section 33 of the said act of 1906 provided:

"The provisions of this title shall apply to all pending proceedings where the duty or duties herein or heretofore imposed, or act or acts heretofore required to be done have not been performed."

By chapter 147, p. 286, Laws 1894, authorizing the construction of the Willis avenue bridge, it was provided that:

"The provisions of law relating to the taking of private property for public streets or places in the said city are hereby made applicable, so far as may be necessary, to the acquiring of the necessary land as aforesaid."

Therefore the amendment to the street opening act made by chapter 658, p. 684, Laws 1906, governing the practice on appeals, affects this procedure. Matter of Commissioner of Public Works, 111 App. Div. 285, 97 N. Y. Supp. 503. And the order appealed from having been entered on a motion to confirm the report of the commissioners is appealable if the city of New York, the appellant, has been aggrieved thereby. In any event, it is appealable in so far as it confirmed the award for damage parcels 16 and 16A, for as to such parcels it was a final order confirming the report of the commissioners.

The city claims the right upon this appeal to review the order of Mr. Justice Truax of February 25, 1904, and asks this court to reverse that order and confirm the report of the commissioners then before the Special Term. This cannot be done. When made the order was not appealable, and, when the statute was amended, the time in which an appeal could be taken from such order had long since expired. I think we must be confined to the consideration of Mr. Justice Guy's order. In so far as he refused to confirm the report of the commissioners and sent the report to new commissioners with instructions, it was an order made on a motion to confirm a report, and if the city claims that report should have been confirmed, and in so far as it was not confirmed, the city was a party aggrieved, and therefore rightfully appeals.

I think so much of this order as directs the report to be sent to new commissioners was improvident, and should at least be modified. The order of Judge Truax provided:

"That the said report of the said commissioners (that is, the first report) in reference to the award made for final damage parcels Nos. 16 and 16A be returned, * * * with directions to report the full absolute fee value for said final damage parcel No. 16A with improvements and to make said awards to unknown owners; and also to allow to the owner of final damage map 16 the value of said parcel taken without deduction for benefit to the land not taken. * * * In reference to parcel No. 12 * * * with instructions to make an award for said final damage parcel No. 12 in the same relative proportion as that made for final damage parcel No. 13. * * * In reference to parcels Nos. 14 and 15 * * * with the instruction to allow the owner of the final damage parcels Nos. 14 and 15 the value of the property taken without deductions for benefits to the land not taken, of which parcels Nos. 14 and 15 were originally a part. And it appearing by the opinion of the said commissioners accompanying their said report that in making their award for the parcel No. 15 they had deducted from their preliminary award for said parcel the sum of $24,850 which they had allowed for wharfage rights assumed to have been taken from the owner of said parcel under the law providing for this improvement, and had also deducted the value of a pier and of land under water, stated in said opinion

to belong to the city, and counsel for Mary Anna Palmer Draper, the owner of the said parcel, having applied, upon the hearing of said motion for confirmation, for an order directing the said commissioners to inform the court, by supplemental report or otherwise, as to how much of said sum of $24,-850 they had deducted as aforesaid for wharfage, how much thereof for said pier, and how much thereof for said land under water, it is further ordered that the said commissioners in the amended, revised, and corrected report to be made by them in pursuance of this order shall specify separately the respective amounts so allowed by them for each of the items aforesaid, aggregating the sum of $24,850."

The commissioners in their supplemental report attempted to comply with this order. The order of Mr. Justice Guy sends the report to new commissioners, not for the purpose of ascertaining the value of this property de novo, but requiring the new commissioners to analyze the figures, the processes, and the methods of thought, by means of which the old commissioners had arrived at the conclusion expressed in their report and of telling the court how the old commissioners did so arrive. This seems to me to be an impossibility, and this part of the order should in my judgment be reversed, and, if the matter is to go back at all, it should be to the old commissioners upon the ground that their award is not sufficient. I doubt the propriety in these condemnation proceedings of requiring a precise statement of the steps by which an award is arrived at, but Mr. Justice Truax's order so provided and the commissioners have undertaken to obey it by stating what they did, and, after that statement, it seems to me the question is: Should the award, the purpose of the proceeding, be confirmed or refused confirmation upon the ground that it is too large or too small?

As to the Swift property parcels Nos. 16 and 16A. In their original preliminary report the commissioners allowed for No. 16, "land, buildings and improvements," $37,473.31, and in their final report, $9,-706.26. For 16A they named the city as the owner of the "land," and gave no value. Mr. Justice Truax ordered them to report the full absolute fee value of said final damage parcel No. 16A with improvements, and to make the said awards for final damage parcel 16A to unknown owners; and also to allow to the owner of parcel No. 16 the value of the parcel taken without deduction for benefit to the land not taken, of which said parcel was originally a part. In their supplemental and amended report they allowed to the Swifts for No. 16 land, buildings, and improvements, $9,706.26, and to "unknown" for No. 16A, land, buildings, and improvements, $27,765.06; and they said in their report:

"Parcels Nos. 16 and 16A. In this case the items of the amount of $27,-765.06 appearing in our preliminary report and deducted from our final report, and which, by the order of the court we are directed to make to unknown owners, are as follows:

| | |
|---|---:|
| Beef house | $13,403 56 |
| Land under pier | 8,261 50 |
| Building | 2,350 00 |
| Pier, two-thirds | 2,000 00 |
| 35 feet bulkhead | 1,750 00 |
| | $27,765 06 |

"The sum of $2,350, the value of the shed owned by the Swift Company, we deducted from our preliminary report for the reason, as stated in our opinion, that while there was no question that the Swifts owned the shed, nor was there any contention to the contrary made before us, the right to continue such structure was revocable at the pleasure of the city authorities and therefore no award could be made for it; that if any award could be made it should be to the Swift Company as the owners."

Counsel for the claimants Swift concede that the supplemental report as to the parcels 16 and 16A, claimed to be owned by them, conform precisely to the order of Mr. Justice Truax sending the report back for revision. The city's claim is that the original report was correct, and that, as title to 16A was in the city, no award should have been made therefor. The Swifts' claim that the property included in that parcel, being included in the description of the lands to be taken, and there being a dispute as to the ownership of said parcel, it was the duty of the commissioners to ascertain and report its value, and to make an award to unknown owners because the title, being in dispute, no power was vested in the commissioners to determine that controversy. I think this position is correct; that, when there is a controversy over the ownership of the land, it is the duty of the commissioners to fix the value thereof, which, upon confirmation, becomes conclusive upon all parties, but that they have no jurisdiction to determine disputed questions of title; and that, therefore, the order appealed from in so far as it confirms the report of the commissioners in respect to parcels 16 and 16A should be affirmed without here considering the particular questions as to title involved, which must be tried out in an appropriate proceeding brought for that purpose.

So far as damage parcel No. 12 is concerned, belonging to the Johnston estate, the appeal by the city will only lie in case it is considered that the order of Mr. Justice Guy refusing confirmation as to this parcel and sending the report to new commissioners to make an award for said parcel in the same relative proportion as that made for final damage parcel No. 13 is appealable because the city was aggrieved in the refusal of the court to confirm as to said parcel. The Johnston estate had a frontage of 322 feet on 125th street and 29½ feet on First avenue. The city took from this property 35 feet of the 125th street frontage, so that the Johnston property was left with 287 feet front on 125th street and 57 feet 9 inches on First avenue. The commissioners in their original preliminary award allowed $5,051 and in their final award $5,301; the additional $250 being for the improvement on the property. In their supplemental report they allowed $11,763.85, and say:

"In accordance with the order of Mr. Justice Truax, we now fix the damage to parcel No. 12 1,525 square feet at $7.714 per square foot, amounting to $11,763.85, which is at the same price per square foot as the award made for final damage No. 12, assuming, as we do, that by 'same relative value' the court intended to direct us to fix the value of the land taken at the northeasterly corner of First avenue and 125th street at the same rate per square foot as the part of the lot taken at the northwesterly corner of said street."

The Johnston estate is quite content with this award, but thinks that the order of Mr. Justice Guy should be reversed because the re-

port ought to have been confirmed, but it has not appealed. Counsel states that, if the whole matter can be considered upon this appeal, its award is satisfactory. This illustrates the position that this court is in in attempting to find out what there is to review and to make the appropriate decision.

The commissioners claim to have done exactly what they were told to do by the order of Mr. Justice Truax, namely, to value this parcel of land in the same relative way that they valued another parcel of land on the opposite corner of the same street, and they say that they valued that property at a certain number of dollars per square foot, and, applying that ratio to the number of square feet in this parcel of property, they arrived at the result set forth. The Special Term said they have misunderstood what Mr. Justice Truax directed them to do, and has sent the whole matter to new commissioners to carry out the directions of the order of Mr. Justice Truax without any interpretation by it of what it thinks the order of Mr. Justice Truax meant. The rule to be applied is that "in no case should an award be made for less than the value of the property actually taken bv condemnation." Matter of City of New York, 190 N. Y. 350, 83 N. E. 299, 16 L. R. A. (N. S.) 335.

The Draper claim consists of two parcels, 14 and 15. Parcel 14 consists of upland, a plot at the southwest corner of 126th street and First avenue, 35 feet on the street and 149.833 feet on the avenue, containing 2.98 city lots, and is the front 35 feet of 6 city lots fronting on First avenue. The commissioners awarded in their original report $24,300. The order of Mr. Justice Truax sending back the report instructed the commissioners to allow the owner the value of the property taken without deductions for benefits to the land not taken, of which parcel No. 14 was originally a part. In their supplemental report the commissioners returned the same amount, and said:

"In making their awards for lands south of the Harlem river, no deductions whatever for benefits were made as erroneously asserted by the counsel for the property owners and tacitly admitted by the corporation counsel."

They state they made up their award for parcel 14 as follows: For the two southerly lots, 25 feet by 100 feet, they fixed the value of each before taking at $9,500, and as 35 feet was taken they allow 50 per cent. of the full value for damage, $9,500. As the next four lots are backed by a lot in the same ownership of 25 feet by 100 feet facing on 126th street, they say there should be allowed only 35 per cent. damage, and they awarded by square feet; that is, 35 feet by 100 feet equals 3,500 square feet, and valuing the corner lot at $13,000, the next at $9,500, and the remaining two at $8,500 each, makes a total value of the entire plot of $38,600, or $3.86 a square foot, making for the 3,500 square feet $13,510 to which should be added $1,585 for damages suffered by the property owners by reason of the fact that the property remaining would consist of four lots and that these front on First avenue but would be reduced to 90 feet in depth, making a total of $24,595, which, however, does not agree with the amount of $24,300 stated in the report.

The theory of the commissioners was that, this piece of property being all in one ownership and not improved, they had a right to consider it in its entirety, and to add the 25-foot front on the side street by 100 feet in depth to the rear of the lots on the avenue, so as to leave four lots of 25-foot frontage by 90 feet in depth, rather than four lots on the avenue of 65 feet in depth and one on the street of 25-foot frontage and 100 feet in depth. We are dealing with city property divided into city lots for purposes of taxation and treated as such in everyday real estate transactions. It seems to me that when the commissioners arbitrarily destroyed the 126th street lot by dividing it into four parcels and tacking each one of those parcels onto the avenue lots so as to create avenue lots of 90 feet in depth instead of 65 feet, as they were when the city took the strip of land from the avenue front, they have considered benefits in violation of the rule laid down by the Court of Appeals in Matter of City of New York, 190 N. Y. 350, 83 N. E. 299, 16 L. R. A. (N. S.) 335. In that case, as to two pieces of the company's land, parts only of such pieces or tracts were sought to be acquired by the city. While the commissioners found that such parts were of substantial value, they also found that the benefit which would accrue to the remainder of such tracts was greater than the value of the lands taken, and hence they made the company no award therefor. This was declared to be error, the Court of Appeals holding that in no case should an award be made for less than the value of the property actually taken by condemnation.

We have held that in the outlying portions of the city, where land has not yet been mapped and laid out in city lots, where a small strip was taken on widening a road, the whole property may be properly taken into consideration (Matter of City of New York [Westchester Ave.] 126 App. Div. 839, 111 N. Y. Supp. 351), but we think that such rule as was followed in this case applied to city lots would be to reduce damages by taking into consideration direct benefits by arbitrarily treating a street lot as converted into the rear portion of an avenue lot. As the commissioners have clearly stated the rule adopted by them in obtaining the result by them reported and as that rule seems to us to be erroneous, it was not error to refuse to confirm their report as to this parcel.

Draper claim, parcel 15, consists in part of upland and in part of land under water comprising 25,644 city lots and being part of a large tract lying on both sides of First avenue, if extended, and including the bed of the proposed extension of First avenue. It has a water front of 170 feet. For this parcel the commissioner made a preliminary award of $192,930.24. In their final report this was reduced to $168,080.24, a reduction of $24,850. They stated that the preliminary award was based upon the erroneous assumption that the one pier taken and the land under it belonged to Mrs. Draper, and upon the further erroneous assumption that respondent was entitled to compensation for wharfage rights appurtenant to the property. In their original final report they state:

"Deducting what we have allowed for the wharfage rights assumed to have been taken from her under this law, and deducting also the value of the

pier and land under water belonging to the city, we feel obliged to diminish our preliminary award by the amount of $24,850."

Mr. Justice Truax refused to confirm the report in respect to parcel 15, and directed the commissioners to inform the court by supplemental report or otherwise as to how much of said sum of $24,850 they had deducted as aforesaid for wharfage, how much thereof for said pier, and how much thereof for said land under water, and that said corrected report should specify separately the respective amounts so allowed by them for each of the items aforesaid aggregating the sum of $24,850.

In their supplemental report the commissioners said:

"The items of the amount of $24,850 deducted from our preliminary report for the reasons stated in our opinion accompanying our final report, are as follows: Deduct land under pier and pier (all but one per cent. belonging to city), $12,850; bulkhead value of lots 14, 15, 16 and 17 at $3,000 each, $12,000."

The commissioners also said in their minutes:

"Referring to the item of $12,850, the commissioners state that they did not make deductions separately for the pier and for the land under the pier under the water, but considered them as a unit and their valuation as inseparable and made their award accordingly."

The counsel for Mrs. Draper complains that the commissioners should have separated the amount they deducted for the pier and for the land under water under the pier, and further claims that, if Mrs. Draper had no right to take this $24,850, the commissioners should have awarded it to unknown owners; that the pier either belonged to the city, standing partly upon land claimed to be owned by the city, to wit, land under water east of the low water line, or it belonged to Mrs. Draper, standing partly on land between the high and low water mark which had been conveyed to her predecessors in title by the grant of 1808; that the wharfage rights attached to parcel 15 and were appurtenant thereto; that these wharfage rights, this pier, and the land under water were taken in this proceeding; and that, as they were taken, it was the duty of the commissioners to make an award for them, and, if there were disputed claims as to ownership, to make the award to unknown owners.

We think that in this latter claim he is fully justified, as we have held in regard to the Swift claim that as the property was included in the proceeding, and there was a dispute as to ownership, and as the commissioners had no jurisdiction to try title, it made no difference whether the dispute was between the city and private owners or between two private owners; that in either event the actual value of the property should have been ascertained and reported and the award made to unknown owners, such dispute to be thereafter settled in the manner provided by law. So that, as to this parcel, we find no error in the refusal of confirmation. The technical conclusion, therefore, which I have arrived at in considering the appeal from the order, is that in so far as it confirmed the awards to parcels 16 and 16A, and, in so far as it refused confirmation to the other parcels, it was correct; but that, in so far as it sent the report back to new commis-

sioners and required of them an impossibility, it was error, and that the order should be modified by striking out said provisions in regard to new commissioners, and providing that the report be referred back to the former commissioners to make a report in accordance with this opinion.

I have not yet touched the real matters in controversy, discussed extensively in the briefs, attempted to be solved upon the former appeal (111 App. Div. 285, 97 N. Y. Supp. 503), and again thrashed out on this appeal, because from the peculiar character of the order appealed from it did not seem that such questions were really before us. But, that an end may be put to this litigation, we have concluded to express our views for the guidance of the commissioners.

First as to the Draper claim. On October 21, 1808, the city granted to Benjamin S. Judah, who owned the upland, "all that certain water lot, vacant ground and soil under water to be made land and gained out of the Harlem river between high and low water mark on the westerly side of said river"—describing it by metes and bounds— "(saving and reserving nevertheless to the said parties of the first part and their successors out of the premises hereinbefore described, so much land as will be necessary to make a street of 40 feet wide on the outward part of the soil hereby granted)," for a reserved yearly rent of $6.49. The covenants for the payment of rent were subsequently released. No right of wharfage or cranage was granted. The city at that time owned the tideway, the land under water between high and low water mark. The effect of the reservation of the 40-foot strip on the outward part of the soil granted was that the fee thereof remained in the city whether the street was thereafter constructed or not. As said by Van Brunt, P. J.:

"A grantor who states in his deed that he excepts a certain portion of the land because he wants it for a certain purpose cannot be held to have conveyed that which he has expressly excluded because he afterwards devotes it to a different purpose." Mayor v. N. Y. C. & H. R. R. Co., 69 Hun, 324, 23 N. Y. Supp. 562; Consolidated Ice Co. v. Mayor, 53 App. Div. 260, 65 N. Y. Supp. 912, affirmed 166 N. Y. 91, 59 N. E. 713.

See, also, Langdon v. Mayor, 93 N. Y. 149; Mayor v. Law, 125 N. Y. 380, 26 N. E. 471.

As there was no grant of wharfage or cranage, the city upon subsequently obtaining land further out than the limits of this grant could have extended and improved the water front for commercial purposes without compensation. Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592.

Chapter 285, p. 420, Laws 1852, provided that:

"It shall be lawful for the mayor, aldermen and commonalty of the city of New York to lay out and fix a permanent exterior street, along the shore of the Harlem river in the city of New York, between the East river or Sound and the North or Hudson river, and to cause a map thereof to be made and which map when approved of and ratified by the said mayor, aldermen and commonalty, shall be filed in the office of the street commissioner of said city.

"Sec. 2. The several streets and avenues of said city as laid out on the map or plan made by the commissioners appointed by the act * * * passed April 3rd, 1807, or as subsequently established by law, shall be continued

and extended along the present lines thereof, from their present termina-
tions on the said map or plan respectively to the said exterior street and
permanent line.

"Sec. 3.  The mayor, aldermen and commonalty of the city of New York
shall be, and they are hereby vested with all the right and title of the
people of this state, to the lands covered with water along the shore of said
Harlem river, from the East river or Sound to the North or Hudson river,
and extending from low water mark to and including the said exterior street
or permanent line."

By section 4 the proprietors of the upland were given the pre-
emptive right in all grants which may be made by the city of the lands
under water granted by the act adjacent to and in front of the said
lands under water heretofore granted by the city.

Three things were accomplished by this act.  The title in the land
under water beyond low-water mark theretofore vested in the state
was transferred to the city to and including the exterior street or per-
manent line, the city was authorized to lay out a permanent exterior
street, and the streets as laid out or as subsequently established by law
"shall be continued and extended * * * to the said exterior
street and permanent line."

Chapter 763, p. 638, Laws 1857, established the bulkhead line or line
of solid filling and the pier line.  Section 2 thereof provided:

"It shall not be lawful to fill in with earth, stone or other solid material,
in the waters of said port beyond the bulkhead line or line of solid filling
hereby established; nor shall it be lawful to erect any structure exterior to
the said bulkhead line, except the sea wall mentioned in the first section of
this act, and piers which shall not exceed seventy feet in width, respectively,
with intervening water spaces of at least 100 feet; nor shall it be lawful to
extend such pier or piers beyond the exterior or pier line or beyond or out-
side of the said sea wall."

Under the authority of the act of 1852, the so-called Southard map,
entitled "Map of the exterior street in the city of New York along
the shore of the Harlem river from Eighty-Ninth street on the East
river to North or Hudson river laid down in conformity with the ex-
terior line as established by the harbor commissioners by virtue of
an act of the Legislature passed April 17, 1857," with the approval
of the mayor October 19, 1859, was filed.  This map exhibited an ex-
terior street 70 feet wide, and this 70 feet in front of the Draper prop-
erty overlapped the outer edge of the old 40-foot strip about 3 feet.
Upon this map, as required by the act of 1852, the streets and avenues
as laid out on the map of the commissioners for laying out the city
under the act of 1807 (Laws 1807, p. 125, c. 115) or as subsequently
established by law were continued and extended to the said exterior
street, namely, 125th, 126th, and 127th streets and First avenue.  Of
said streets and avenues as extended so much thereof as were em-
braced in the 40-foot strip reserved in the Judah grant the title thereof
was and remained in the city because the fee of said strip remained
in the city.  So much of said street as was beyond the low-water mark
was on the land of the city granted by the state in said act.  "As the
city then owned in fee the land upon which all, or nearly all, its streets
were constructed, and as it was the settled policy of the city to con-
demn or purchase land in fee for its streets, it cannot be supposed

that it meant to depart from the usual course in this grant and actually convey away the fee of the land needed for streets." Mayor v. Law, 125 N. Y. 380, 26 N. E. 471.

This being the condition of fact and law, on August 11, 1870, the city granted to Courtlandt Palmer, Mrs. Draper's father and predecessor in title, a certain lot of land under water by metes and bounds, which commenced at the original line of low water and extended out to the harbor commissioners' bulkhead line about 67 feet in depth and lying immediately in front of the Judah grant then owned by said Palmer, saving and reserving out of the hereby granted premises so much thereof as may form part of any street or streets, avenue or avenues, that may now or hereafter be assigned or laid out through said premises according to law for the uses and purposes of public streets, avenues, and highways as hereinafter mentioned, or which are now in use as such.

Said grant provided that within three months after being thereunto required by the city Palmer and his successors would build at his own cost bulkheads, wharfs, streets, or avenues and maintain them, which should be public streets, and, in default, the city could build such streets and bulkheads on account of Palmer, or sell the premises granted; that Palmer would not build said wharfs and streets until permission had been obtained from the city, and would not build any pier or obstruction in the Harlem river in front of the granted premises without the city's permission. Wharfage and cranage was granted excepting from the bulkhead at "the foot of any street or avenues which are laid out through the premises hereby granted, which said wharfage, cranage, advantages, and emoluments shall be and are hereby reserved for the said party of the first part, their successors or assigns, with full power to collect and receive the same for their own proper use and benefit forever. * * * And the said party of the first part hereby releases and discharges said party of the second part, his heirs and assigns from the covenants and provisions contained in said hereinbefore mentioned grant to Benj. S. Judah relative to a street of 40 feet in width therein proposed to be made on the outward part of said grant, such then proposed street having been superseded and the strip of land in such former grant is hereby released and quitclaimed to said party hereto of the second part, his heirs and assigns, subject, nevertheless, to the covenants and conditions in this present grant contained." Counsel for Mrs. Draper concedes that the reservation in this grant contained operates to reserve the land lying within the 70-foot strip—the exterior street laid down on the Southard map. The Court of Appeals in Consolidated Ice Co. v. Mayor, etc., 166 N. Y. 92, 59 N. E. 713, held:

"The lands embraced within the lines of the exterior street were not, therefore, conveyed to the plaintiff's predecessor in title by the grant of 1870."

We think that so much of First avenue and 127th street continued and extended on the Southard map by force of the act of 1852 as lies within said 40-foot strip was not released. What was intended to be released was so much of the 40-foot street as had been superseded as a street by the new exterior street beyond it. It was not intended,

and could not have been intended, to cut off access to said exterior street through these streets of approach. First, the intention of the Legislature was clearly expressed because it provided that these streets should be continued to the exterior street to form approaches thereto; second, the understanding of that purpose by the city was expressed by the Southard map, which did that very thing; and, third, the grant to Palmer itself in unmistakable language expressed the intent of the city when it granted wharfage and cranage to Palmer except "at the foot of any street or avenue which was laid out through the premises hereby granted," First avenue and 127th street then being such streets or avenues. I do not think the city intended to grant the fee of so much of said streets as lay within said strip, and I do not think it had the power so to do. The grant is to be construed as of the time when made and the conditions then existing; that is, the connecting streets extended and a new street contemplated.

The matter of the pier will be hereafter considered.

As to the merits of so much of the Swift claim as is included in final damage No. 16A. On November 30, 1866, the city conveyed to Daniel P. Ingraham, then owner of the upland and abutting land, "all that piece of land lying between high-water mark and the bulkhead line as now established of the Harlem river in front of the upland owned by the said party of the second part between 126th and 128th streets," describing it by metes and bounds, namely:

"Saving and reserving out of the hereby granted premises so much thereof as may form part of any street or streets, avenue or avenues that may now or hereafter be designated or laid out through said premises according to law for the uses and purposes of public streets, avenues and highways hereafter mentioned."

Two years after said grant the Legislature passed chapter 150, p. 261, Laws 1868, which provided that:

"It shall be lawful for the proprietors of grants of land under water in the Harlem river, between the termination of the Second avenue and the East river, instead of building an exterior continuous bulkhead, as now laid out by the harbor commissioners, to erect piers and wharfs therein and to excavate the slips between the same, but in no case shall any such pier or wharf be extended into the river further than the said exterior line as fixed by the said harbor commissioners."

On March 16, 1871, the board of docks upon petition adopted a resolution giving permission to Judge Ingraham "to build piers out to the harbor commissioners' bulkhead line from 125th to 128th streets, Harlem river, such permission to be subject to any alteration which the department of docks may by law be empowered to make in said district, and with no expense for damage against said department." The improvements contemplated comprehended a bulkhead to be built a considerable distance inside the established bulkhead line and from said bulkhead to extend the piers into the river. Under the act and this permit Judge Ingraham improved the property by building substantial piers, with bulkheads, and between the piers excavated slips sufficiently to allow boats to land at the bulkheads and at the sides of the piers. Ingraham was the predecessor in title to the Swifts, and

their deeds expressly excluded conveying or intending to convey any portion of 127th street.

Counsel concedes that the grant of November 30, 1866, to Ingraham of the land under water, reserved or excepted the fee of the land included within the boundaries of the exterior street laid out by the common council in 1859. He claims that the Swifts do not base their title upon the water grant, but upon the act of 1868 which was effectual to vest title in Ingraham to the land when he constructed the pier, bulkhead, slips, etc., thereon, the argument being that the state in 1868 had the power to grant to the proprietors, namely, the upland owners, an absolute right to construct wharfs and piers upon the land under water of the Harlem river, notwithstanding the act of 1852, providing for an exterior street along the shore of that river, and granting to the city the title to the land included thereon.

In the Consolidated Ice Co. Case, supra, the court, after deciding that the lands embraced within the lines of the exterior street had not been conveyed, said:

"It does not necessarily follow, however, that the plaintiff has not acquired some rights of user in the waters adjoining the lands conveyed and which were annexed to it by the act of 1868, authorizing the construction of piers and wharves and the excavation of slips between them; but that question we do not pass upon, as it is not before the court for determination."

I have reached the conclusion that while the title to the land under water, which was vested in the city by the act of 1852, was not divested by the act of 1868, that, being upon a navigable stream, it was held for the same public trusts that it had been held prior to the act of 1852 by the state in the public interests. The nature of this title, both in the state and as conferred by it upon the city, is set forth in the Matter of the City of New York, 168 N. Y. 134, 61 N. E. 158, 56 L. R. A. 500 (the Speedway Case), with a full citation of authorities. When the state authorized the proprietors of the water grants, in the interests of navigation and commerce, to erect piers and dig out slips, and when the city by its dock department granted its permission, and when, acting under such authority and permission, Ingraham built the pier and dug out the slip, expending his money therefor, I think he acquired property rights which could not be taken from him without compensation. Whether this permit from the dock department should be considered a revocable license because of the provision therein contained, "subject to any alterations which the Department of Docks may by law be empowered to make in said district," or not, it seems sufficient to say that the department of docks has made no such alteration in said district, and has not revoked said license by any act done by it.

This property is being taken by authority of law for an entirely different purpose, to wit, for the foundations and bridge across the river, and is in no sense an aid to the navigation thereof, but an obstacle thereto, even if it be a drawbridge, and the law which authorized it and the petition which instituted the proceedings provided for the acquiring of title to the lands and premises, rights, and easements required.

A valuable right which has been in existence since the year 1871 is being destroyed for the purpose of a public improvement. Mere easements òf the light, air, and access in the public streets·have been held in innumerable cases in this state to be property rights, and for the destruction thereof the courts have compelled the payment of vast sums of money. In the Speedway Case, cited supra, it was conceded that the title in the tideway was in the city; that the title of the proprietor of the upland extended to high-water mark; that, while he did not own the tideway or the lands under water beyond the same, he had the easement of passage and the transportation of merchandise to and fro between the navigable waters, to fish and to draw nets to land, and to load and unload boats. These privileges are absolute property rights as against all but the state. The state holds the title in fee in the tideway and to the lands under water beyond the same as trustees for the public in its organized capacity. As such trustee and in the exercise of its governmental functions, it may improve the tideway or the adjacent waters for the benefit of navigation, even to the detriment of abutting upland owners, and without compensation to them. But as the speedway, which was erected in front of the appellant's property, was limited in its use to certain vehicles and cut him off absolutely from the river, the court said:

"It is unnecessary to inquire whether the appellant would be entitled to compensation for loss of his riparian easements if the municipality had laid out and constructed in the tideway a general street open to commercial traffic. * * * Nor are we concerned with the extent of appellant's alleged loss. * * * And it may even be, as suggested, that the appellant's lands are more valuable now than they were before the construction of the speedway. * * * The fact remains that the question whether the appellant has been injured by the taking of his riparian easements and the extent of his injuries, if any, has never been passed upon. He was entitled to have that question decided, and the refusal of the commissioners to consider it was error."

There was a mere riparian right; it being conceded that the appellant's land stopped at the high-water mark and that the title to the tideway was in the city. In the case at bar the title to the 70 feet reserved in the city's grant remains in the city, but for purposes of navigation the state and the city have authorized the erection thereon of a pier.

In Bedlow v. Stillwell, 158 N. Y. 292, 53 N. E. 26, the court said:

"Although the pier was erected upon land under water which belonged to the state, yet it was erected under and in pursuance of a statute and by the permission of the city authorities, and that under such circumstances it became attached to the realty and part and parcel of it. * * * The permission * * * to construct at their own expense this pier which became appurtenant to his wharf was something more than a mere license revocable at the pleasure of the state. It was a right to use and maintain the pier in perpetuity, and neither the city nor the state would lawfully deprive the owners of its benefits without just compensation."

In Matter of Pier 15, 95 App. Div. 501, 88 N. Y. Supp. 906, where a permit had been given to shed a pier in 1883, after the passage of the shedding act, which permit did not upon its face state that it was granted during the pleasure of the commissioners or any other statement tending to show that it was revocable, this court held that no

authority was given to the dock department to revoke such license when once given, and that when the city of New York, exercising the power of eminent domain, commenced a proceeding to acquire title to the property, it was a property upon which the appellants were entitled to maintain this structure, and it was the value of that pier with the right to maintain this structure to which the appellants were entitled, and the report was sent back. On the second appeal the order was affirmed on the former opinion; McLaughlin, J., dissenting.

It was affirmed (185 N. Y. 607, 78 N. E. 531), the court saying:

"While we do not assent to the doctrine that the right of the pier owners to an exclusive use of the pier as a shedded pier and to be relieved of the burden of having vessels put in at the wharf was beyond legislative repeal or modification, still, as at the time this property was acquired by the city no such repeal had been made, the value of the property was to be estimated under the existing conditions of the law. While the report states that the award was made upon the theory of the right being in perpetuity, still the entire record discloses that it was made in accordance with the true rights of the parties. The order should be affirmed."

It would seem, therefore, that the valuable property right in this pier taken by proceedings not in the interest of navigation, but for other public purposes ought to be paid for, and that the value of that right so taken should be appraised by the commissioners.

The Draper claim is slightly differentiated, in that the grant of 1870 was made after the act of 1868 which authorized the building of piers. But Palmer and Ingraham asked permission from the dock department at the same time and the resolution above cited gave permission to both petitioners by name and they conducted their improvement at the same time and upon a common plan. I think Draper's pier as a pier erected under legislative authority and by municipal permission stands in precisely the same situation and should be treated as an existing property right and valued accordingly.

My conclusion as to the Draper claim is this: that, as to the 40-foot street reserved by the Judah grant, the title did not pass to her predecessor in title, but remained vested in the city until by the grant of 1870 it was released to her. At that time, however, by the act of 1852 and the filing of the necessary maps, the streets had been extended to the new exterior street, the title of all of which remained vested in the city. I do not think she is entitled to recover damages for any portion of such land lying within said streets as land; that, so far as the pier is concerned, this was erected under authority of law proceeding from the state and the city, and that whether the fee to the land under water occupied by her was in her or not is immaterial. She was entitled to the entire beneficial use thereof which had not been interfered with by any authority, state or city, until the inauguration of this proceeding and that she was entitled to recover the fair value thereof, of which she is by this proceeding deprived. Her wharfage rights, independent of the pier, I think will be preserved to her on the outer margin of the new street to be constructed (Mayor v. Law, 125 N. Y. 392, 26 N. E. 471), and that she is not entitled to recover therefor where they are not interfered with by the erection of the bridge.

The order appealed from should be modified by directing the report to be returned to the former commissioners, with direction to proceed in accordance with this opinion without costs to any party. All concur.