In the Matter of the Application of THE CITY OF NEW YORK, Relative to Acquiring Title, Wherever the Same Has Not Been Heretofore Acquired for the Same Purpose in Fee to the Real Property Required for the Opening and Extending of East River Drive from East Ninety-second Street to East One Hundred and Twenty-second Street, Together with the Additional Lands and Rights Therein to Be Acquired in Connection Therewith, as Shown on a Map (in Two Sections) Adopted by the Board of Estimate and Apportionment on November 9, 1934, and Approved by the Mayor on November 9, 1934, in the Borough of Manhattan, City of New York.

Supreme Court, Special Term, New York County, May 29, 1936.

*Paul Windels, Corporation Counsel* [*Eugene L. Brisach, Assistant Corporation Counsel,* of counsel], for the City of New York.

*Skinner & Bermant* [*Bernard L. Bermant* of counsel], for the claimant Waterfront Realty Corporation.

*Talley & Lamb* [*Charles Lamb* of counsel], for the claimants Escutcheon Holding Company and others.

*Truman H. Baldwin & Sons* [*Ralph L. Baldwin* of counsel], for the claimant Gallatin, Anderson & Gay.

*Larkin, Andrews & McNaughton,* for the claimant Harlem River Holding Corporation.

*Egan & O'Reilly* [*Dominick L. O'Reilly* of counsel], for the claimants Metropolitan Steam Laundry Company and others.

*Cohen, Gutman, Goldberg & Zorn* [*E. C. Hamburg* and *Morris T. Hamburg* of counsel], for the claimant Benson Point Realty Company.

*Goldwater & Flynn* [*Chas. A. Molloy* of counsel], for the claimants Burns Bros. and others.

*Thomas E. Shea,* for the claimant Central Coal Company.

*Baar, Bennett & Fullin* [*J. E. Whalen* of counsel], for the claimant Frank H. Wood Coal Company.

*Neidle & Taylor* [*N. Taylor* of counsel], for the claimant Collins Estate.

*Joseph D. Nunan* [*Myron J. Kleban* of counsel], for the claimants Kenlon Coal Company and others.

*Harry M. Edelstein* [*Geo. Schenker* of counsel], for the claimant Alloca, Greenfield & Rissi.

*James A. Lynch* [*Dominick A. O'Reilly* of counsel], for the claimants Kayell Sanitary Wiping Material Corporation and others.

*Joseph B. Schwartz* [*Samuel L. Russ* of counsel], for the claimant United Bottle Supply Company.

*Henry M. Stevenson* [*H. L. Kanter* of counsel], for the claimant Ketchum Estate.

*Whiteside, Hill & Leavenworth* [*Irving L. Levey* of counsel], for the claimant Cheeseborough Realty Company.

*Edgar J. Foster,* for the claimant Harlem Market.

McLAUGHLIN (CHARLES B.), J.    This is a condemnation proceeding for the acquiring of property along the Harlem river from East Ninety-second street to East One Hundred and Twenty-second street.    The property taken includes land and land under water. The proceeding is somewhat unusual, as many of the parcels involve serious questions of title which must be determined before any quantum figures are arrived at.

The city of New York is or was the owner of the land under water between high- and low-water mark throughout the length of this proceeding. It derived title to this tideway by the Dongan Charter of 1686, confirmed by the Montgomerie Charter of 1730. This title has been preserved by the various Constitutions of the State of New York. (*Mayor* v. *Hart,* 95 N. Y. 443; *Saje* v. *Mayor,* 154 id. 61; *Jarvis* v. *Lynch,* 157 id. 445; *Consolidated Ice Co.* v. *Mayor,* 166 id. 92; *Burns Bros.* v. *City of New York,* 178 App. Div. 615; affd., 232 N. Y. 523.) The courts have held time and again that the title such as the city holds is in its sovereign capacity, and not in any proprietary capacity. (*Coxe* v. *State,* 144 N. Y. 396, 405, 406; *De Lancey* v. *Piepgras,* 138 id. 26; *Tiffany* v. *Town of Oyster Bay,* 234 id. 15; *People ex rel. Squires* v. *Hand,* 158 App. Div. 510, 516, 517; *People ex rel. Howell* v. *Jessup,* 160 N. Y. 249.) It is true that the case of *Appleby* v. *City of New York* (271 U. S. 364, at p. 397) seems to infer that the State had granted the tideway to the city in fee, and not in trust for the public. However, the decision of the case does not depend upon how the city held the property, but rather upon what the city granted. The case distinctly holds that the city " intended to part both with the *jus publicum* and *jus privatum.*" It would appear that the city could only be revested with them by a condemnation of the rights granted. It is apparent that the question of whether the city held the land in its sovereign capacity or merely as proprietor was not passed upon by the court. It is too well settled now for this court to question the title of the city of New York to the tideway in its sovereign capacity.

Prior to 1852 the city of New York did not own any of the land under water outshore from the mean low-water line. By chapter 285 of the Laws of 1852, the mayor, aldermen and commonalty of the city of New York were authorized to lay out and fix a permanent exterior street along the shore of the Harlem river, and to prepare and file a map showing such street. This act also provided that the streets and avenues as laid out on the street commissioner's map of 1811, made pursuant to chapter 115 of the Laws of 1807, or as subsequently fixed by law, should be continued and extended along their present lines to the said exterior street. By the provisions of this act the city of New York became vested with all the right and title of the State of New York to the lands under water lying between the low-water line and easterly line of Exterior street. The city obtained this land in trust for the public and in its sovereign corporate capacity. (*Burns Bros.* v. *City of New York, supra,* at p. 620.) This case also holds that the city took title to these lands subject to the riparian rights of the upland owners.

By chapter 121 of the Laws of 1855 the Legislature authorized the appointment of harbor commissioners, who prepared a map showing the bulkhead and pierhead lines, which was approved by the Legislature by chapter 763 of the Laws of 1857. From 1852 to 1859 the common council of the city of New York passed various resolutions concerning the proposed map, as required by chapter 285 of the Laws of 1852. As a result thereof, the " Southard Map " of 1859 was adopted.

On September 28, 1871, the Commissioners of the Land Office executed and delivered to the city of New York a water grant for lands outshore of the easterly line of Exterior street at varying distances between Eighty-ninth street and One Hundred and Thirtieth street. Pursuant to the authority contained in several acts (Laws of 1882, chap. 410; Laws of 1884, chap. 517), the department of docks in 1887 established a new and different bulkhead line from that of 1857. This action was approved by the Secretary of War, and is now known as the United States bulkhead line of 1890.

It appears that between January 16, 1866, and March 16, 1871, the city of New York made a series of grants to certain individuals for portions of the lands under water in this proceeding. All these grants ran to the easterly line of Exterior street, as shown on the Southard map of 1859. Every such grant contained an exception in substantially the following language: " Saving and reserving out of the hereby granted premises, so much thereof as may form part of any street or streets, avenue or avenues, road or roads, bridge or bridges, that may now or hereafter be assigned, designated or laid out through said premises according to law for the uses and purposes of public streets, avenues and highways, as hereinafter mentioned, or which are now in use as such." There is a further covenant that the streets and avenues mentioned shall forever remain public streets.

It has been settled that the title to the land formerly under water and embraced in the confines of Avenue A and Exterior street, as shown on the Southard map of 1859, is still in the city of New York. This land was not included in the grants and no title to it passed to the grantees. (*Consolidated Ice Co.* v. *Mayor,* 53 App. Div. 260; affd., 166 N. Y. 92; *Burns Bros.* v. *City of New York, supra; Mayor* v. *Law,* 125 N. Y. 380.) The grantee never obtained any title to the bed of these streets and it is immaterial whether the city ever opened the streets on the map. (*Matter of Commissioner of Public Works,* 135 App. Div. 561, 573, 574; *Las-Daub Realty Corp.* v. *Fain,* 214 id. 8, 13.)

The land in these streets always remained in the city of New York, unaffected in any way by the grants referred to. No title

ever passed to any of the successors of the original grantees. Their title is limited by the terms of the grant. When the Legislature closed Avenue A between East One Hundredth street and East One Hundred and Sixth street (Laws of 1875, chap. 494), the effect thereof was to keep this property in the city of New York in its sovereign capacity. The fee of Avenue A was never obtained by the owners of the water grants, and even if we had a complete closing by reason of this act, no title to the street could pass to the abutting owners under such circumstances. The claimants rely for title upon the decision in *Matter of City of New York (Willard Parker Hospital)* (217 N. Y. 1). There title was held to be in a claimant by adverse possession. The case involved ambiguous statutes and also a change of the location of an exterior street by the discontinuing of Tompkins street and the erecting of East street as an exterior street, which was further outshore. Without passing upon anything else at this time, it is sufficient to say that the adverse possession in that case started at the latest period in 1855, while in this proceeding the earliest that any adverse possession commenced was in 1883. Since 1873 the lands such as these are inalienable either by deed or by adverse possession. Therefore, the case is not in any way controlling.

The claim of adverse possession against the city of New York is without foundation. It must be borne in mind that the predecessors of these claimants took title to what they have by virtue of grants from the city of New York. The grants themselves excepted and recognized title to Avenue A and Exterior street to be in the city of New York. The title of the city was thus recognized. The claimants' predecessors had permission by virtue of the grants to use the land. The proof in the case shows that to do anything with regard to the improvement of this land in these streets, they must obtain the consent or direction of the city authorities. They sought it by asking permission to fill it in. Such occupation as has been had in this case was not in hostility to the city's title, but was in confirmation of it, for everything done upon which the claim of adverse possession rests seems to be in consonance with the terms of the grants. (*Mayor* v. *Law, supra,* affg. 53 Hun, 637; reported in full, 6 N. Y. Supp. 628; *Burns Bros.* v. *City of New York, supra; Hinkley* v. *State of New York,* 234 N. Y. 309, 316.) For that reason alone it sufficiently appears that the claim of adverse possession is without merit. Moreover, it is a fact that these particular claimants entered into possession of the respective portions of Avenue A and Exterior street by virtue of an easement of access and egress over and across these streets so as properly to use the remaining land in conjunction with access to the water. Such a

right may not ripen into a fee title by reason of adverse possession. (*Brooklyn, Queens County & Suburban R. R. Co.* v. *Bird*, 76 Misc. 62, 69; affd., 152 App. Div. 932; *Bridges* v. *Wyckoff*, 67 N. Y. 130, 133; *Bedell* v. *Shaw*, 59 id. 46.) For this additional reason there is no valid claim of adverse possession.

Since 1873 the waterfront of the city of New York is inalienable (Laws of 1873, chap. 335, § 102). The provisions of this law were continued in the charter of 1897 (Laws of 1897, chap. 378). This prohibition is now section 71 of the Greater New York Charter. It has become the subject of judicial decision, and the Court of Appeals has held that since that year (1873) no title by adverse possession may be had against the city as to any portion of its waterfront. (*Matter of City of New York* [*Piers Old Nos. 8–11*], 228 N. Y. 140.) It is not necessary to decide whether the act of 1873 would break the running of the time required by statute when it started prior to 1873. There seems to be authority for that contention. However, the asserted possession in any instance in this proceeding did not commence before 1883. This is long subsequent to 1873, and no claim of adverse possession may be based upon it. We, therefore, come to the conclusion that the city of New York alone has title to both Exterior street and Avenue A throughout the length of this proceeding where it lay beyond the original high-water mark.

Another question raised in this proceeding is one involving accretion. Both the city and the claimants agree that ordinarily the riparian owner may obtain land by accretion. (*Cramer* v. *Perine*, 251 N. Y. 177, 184; *Trustees, etc., of Town of East Hampton* v. *Kirk*, 84 id. 215.) The dispute narrows itself down to the proposition of who has the burden of proof to establish accretion. Each side claims that the burden is upon the other. As the court views it, the burden is on the party who asserts title by accretion.

A change in the boundary of property may not be presumed. The burden of establishing any such change is upon the claimant. (*Green* v. *Horn*, 142 App. Div. 90.) The burden of proof is also on the claimant asserting as a fact that a street called for as a boundary is not a legal highway. (*Matter of City of Brooklyn*, 73 N. Y. 179.) So, too, the burden is upon the claimant who alleges that the location of the boundary line has been changed by the action of the forces of nature. (*State* v. *Muncie Pulp Co.*, 119 Tenn. 47; 104 S. W. 437.) The burden of establishing any title is upon the party asserting that title. (*Matter of Mayor, etc., of New York* [*Walton Avenue*], 131 App. Div. 696, 714; *Skelly* v. *Met. El. R. Co.*, 1 id. 51; *Goldstein* v. *Goldman*, 74 id. 356.) It is also the rule that there is a presumption of title in the State to lands under

tidewater. (*People ex rel. Underhill* v. *Saxton*, 15 App. Div. 263; affd., 154 N. Y. 748.)

This question is squarely presented by the claim made regarding damage parcels 9, 10, 13, 17 and 21. It appears that on December 24, 1841, a sale of five designated lots on the " Map of property belonging to Morris Randel situated at Harlem made October 26, 1826, by J. F. Bridges, City Surveyor," was made to the predecessor of the claimant. The lots were located on the southerly side of East One Hundred and Ninteenth street and ran easterly to the Harlem river. The description then would carry easterly to the westerly line of damage parcels 9, 10, 13, 17 and 21. The description thus made in the deed of 1841 would *prima facie* be limited to the upland as fixed by the Bridges map of 1826. (*Sage* v. *Mayor*, 154 N. Y. 61.) The high-water line on that map is inshore of the present high-water line. The high-water line of the Randel map, 1818–1820, is not only outshore of the Bridges map line, but for the greater part of this property it is outshore of the present high-water line. Were it not for the deed fixing the boundary by the Bridges map of 1826, the court would award damage parcels 9, 10, 13, 17 and 21 to the claimants. There must be proof of accretion or erosion before the court may indulge in any such violent presumption which would hold that there was erosion between 1818 and 1826 and accretion thereafter. There is no proof or claim of adverse possession subsequent to 1841, although it could have readily been consummated long before 1873. The claimant rests upon a presumption of accretion. By accretion he would obtain more land than he formerly owned. (*Mulry* v. *Norton*, 100 N. Y. 424, 432.) In other words, he asserts title to land. Having asserted that fact, he must prove it just as one who claims under a deed must prove the deed. There has been an utter failure to establish such proof and there may be no award to the claimant for damage parcels 9, 10, 13, 17 and 21.

A similar question is raised as to damage parcel 26. Again the limit of the deed must govern. That would give damage parcel 25 to the claimant and the westerly portion of damage parcel 26 (which should be called damage parcel 26A) should also go to the claimant. The deed conveys to the high-water mark as fixed by the Bridges map of 1826. The evidence at this point is convincing enough to find that that line in 1826 was accurately drawn on this map. There is no proof of accretion since 1841, or, for that matter, since 1826. There is some evidence of filling in, but that does not give the riparian owner any title or ownership in the filled-in lands. (*Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75, 84.)

Another question now presented is whether the claimant shall receive damages for the building erected partly on claimant's land and partly on that of the city. This building was lawfully erected upon the claimant's land. So far as the evidence discloses, it would be difficult to find that the claimant was a trespasser upon the city's land. It received permission to erect the building in 1899. It may be argued that no legal permission could be given. But it would be a somewhat inequitable conclusion to find that no compensation should be paid for this building under the circumstances disclosed. A situation similar to this was recognized by Judge Pound in construing the Barge Canal Act (*Watson* v. *Empire Engineering Corp.*, 77 Misc. 543). In that case the plaintiff was regarded as a licensee when he had built within the line of the State property, and the State had acquiesced in his remaining there for almost forty years. It was also held in another case that the State, having allowed structures erected by a claimant on a strip of land to remain unmolested for more than thirty-five years, rendered itself liable in damages by its appropriation of such structures. (*Banner Milling Co.* v. *State of New York*, 117 Misc. 33; affd., 210 App. Div. 812.)

In regard to damage parcels 26 and 26A, it is clear that the building erected thereon was intended to be a single building; it is also evident that the land upon which it was erected was upland; that it passed apparently from the control of the dock department to that of the building department of the city of New York. The least that may be said is that the city gave a license to have this building erected in part upon its property. Such would be the conclusion to be reached by the action of the building department in permitting the building to be erected so as to extend to a point almost at the present high-water mark. It would be grossly unjust to say that under those circumstances this property owner should not be compensated for a building built lawfully in part upon its own property, and lawfully built upon the city's property with its consent and under its license. The issuance of a permit by the city to erect structures and its acquiescence operated as a license and the owner became a licensee. As such licensee he was entitled to notice requiring removal by him prior to the vesting of title. No such notice was given and he is entitled to damages for the value of the building. (*Matter of City of New York* [*North River Water Front*], 219 App. Div. 27; *Chicago, S. F. & C. Ry. Co.* v. *Ward*, 128 Ill. 349; 18 N. E. 828, 832.)

A different situation, however, is presented with regard to the buildings and improvements erected on the beds of Avenue A

and Exterior street. When the property owner built any buildings or improvements upon the beds of these streets, he did so under a revocable permit. When he took his grant from the city of New York for these lands lying under water, he knew that the beds of Exterior street and Avenue A were never granted or deeded to him. They were excepted from his grant. Title to these properties remained in the city of New York. It is immaterial whether the streets were opened or not. The property owner could get no more than was contemplated or included in the terms of his grant. He is bound by those terms. When he built upon the property of the city of New York, after due notice, all the buildings and improvements thus erected became the property of the city of New York. No compensation of any kind may be had as a result of such action on his part. It is immaterial whether he believed he had the right to do so, because he is controlled by the terms of the grant. There is no proof of any agreement to the contrary, and upon the evidence as produced no award will be made for any of the buildings or improvements erected on the beds of Avenue A and Exterior street. (*Village of St. Johnsville* v. *Smith,* 184 N. Y. 341; *Matter of Long Island Railroad Co.,* 6 Thomp. & Cook, 298; *Matter of New York, West Shore & Buffalo Ry. Co.,* 37 Hun, 317.) It might be stated that the failure of the city to exercise its rights to cut through Avenue A or Exterior street does not cause the loss of title to the city or any gain in title by the claimant. (*N. Y. C. & H. R. R. R. Co.* v. *City of Buffalo,* 200 N. Y. 113, 120; *Mayor* v. *Law,* 125 id. 380, at p. 390.) The court does not believe that, in the case of land under water, reserved for public streets, which was given to the city under its sovereign power and in its capacity as trustee for all the people, it could be alienated by any action upon the part of the commissioner of docks. This situation is different from that with regard to damage parcel 26, the difference being that the superintendent of buildings, with respect to damage parcel 26, duly allowed the erection of the building as a license, whereas in the instance of Avenue A and Exterior street, there never could be any permission granted, as this land under water was reserved for the public to be used only as streets. The property on damage parcel 26 was not so reserved, and it does not lie in the bed of any reserved streets.

These claimants to the land in the beds of Avenue A and Exterior street urge that, as they received the grants from the city of New York and as the dock department gave them permission to build, they should be reimbursed for the buildings that they had thus erected upon the city property. It must be observed that in

every instance the city held title to these excepted portions of the grants in their sovereign capacity and no dock commissioner or the head of any other department could give permission to use this property except as a street. He could give a license to build on the excepted portion until they were required for city streets. It would appear, therefore, that the buildings were so built upon city property. The most that can be said in such instances is that they have the rights of licensees and nothing more. They knew when they took these grants that these portions of land were reserved for streets. When they got permission they simply obtained it as licensees. They had the right to use it until it was required for city streets. Now it is required that they be used for city streets and no compensation should be paid to them for the value of the buildings. All these claimants were entitled to was a reasonable chance or opportunity to remove the buildings. They all had this opportunity. Some availed themselves of it and removed their property either in whole or in part. Others did not. At any rate, they could not claim any damages for the value of the buildings because their only right was to take these buildings off the city property, and as they did not avail themselves of that, they cannot be heard now to ask for damages.

The portion of Avenue A between One Hundredth and One Hundred and Sixth streets was discontinued by laws known as chapter 494 of the Laws of 1875. The Legislature discontinued this street. There was no doubt as to the power of the Legislature to discontinue a street which is merely a proposed one upon a map. However, this was land under water originally; it belonged to the city in its sovereign capacity, and, although the Legislature took away from it the character of a street, nevertheless it again became water front property which the city held in its sovereign capacity. Holding it in such capacity prevents any one from giving permission to use it by the erection of buildings thereon. It is true that land under water abutting upon the bulkhead can be used for purposes of navigation and commerce and that the city may grant such use for private individuals. It cannot, however, so grant a city street. Between the discontinued Avenue A and the bulkhead there was a city street — Exterior street — seventy feet wide, which could not be granted for any purpose. Therefore, Avenue A could not be used for any purpose of navigation because it did not abut upon the bulkhead. The only exception to the disability of the city to grant being thus eliminated, the permission to use was futile and lasted only so long as the city permitted the use.

The question of riparian rights is involved in the fixing of damages for this waterfront property. The Court of Appeals has defined these rights. " In general terms they connote the right and profit to the owner of the upland arising from its connection with the water, such as the easements of passage and use, subject, however, to governmental regulation for the improvement of navigation." (*Matter of City of New York* [*West 205th Street*], 240 N. Y. 68, 72.) The riparian rights may only be taken away by condemnation and payment of damages unless they are destroyed by the State or city in the exercise of the sovereign right to improve the waterfront for commerce or navigation. In the latter instance, the State or city destroys these rights without being liable to pay compensation. (*Matter of City of New York* [*Jamaica Bay*], 256 N. Y. 382, 389; *Sage* v. *Mayor, supra*, at p. 71.) These rights could, therefore, be destroyed by any substantial improvement in aid of commerce and navigation, and when such improvements were made by the city of New York the riparian rights of the upland owner were lost to him. No compensation should be made under such circumstances. This is the situation disclosed between One Hundred and First street and One Hundred and Fourth street. The city of New York erected a granite bulkhead along the United States bulkhead line and filled in the land behind it. It is plain that this was an improvement for the benefit of navigation and commerce because large boats could then be wharfed alongside the bulkhead. The city had the legal right to do this. (*Sage* v. *Mayor, supra*, at p. 83.) It would appear, however, that the wharfage and cranage rights remained with the upland owner, not as a riparian right but by force of the grant. These bulkhead rights were not taken back by the city of New York.

Another question raised by the claimants is their claim that they have exclusive beneficial interest in the lands formerly under water and lying in the bed of Avenue A and Exterior street. The court does not believe this contention to be tenable. The parties to these grants are bound by their terms. There is nothing in the language which would give such an exclusive beneficial ownership. Avenue A and Exterior street are excepted from the grants. It is immaterial that they may be classed as mere paper streets. The fact is that no title in them passed to the grantees. *Burns Bros.* v. *City of New York* (*supra*, at p. 623) recognized that the decisions of the Court of Appeals in *Consolidated Ice Co.* v. *Mayor* (166 N. Y. 92) and *Mayor* v. *Law* (125 id. 380) prevented the giving to the grantees of an exclusive beneficial ownership in the land lying in the bed of Avenue A and Exterior street. Under the authorities, all the claimants have in these lands (Avenue A

and Exterior street) consist of riparian rights, including what is known as bulkhead rights.

On the trial the city attempted to separate trade fixtures and divide them into two classes, one that was so securely attached to the realty that it could not be removed, and the other consisting of those fixtures which were only bolted or screwed to the floor. The court believes that our highest court holds that a trade fixture is some machine or implement used in a trade and which has been so fixed to the realty that the removal thereof will cause substantial damage. (*Jackson* v. *State*, 213 N. Y. 34; *Matter of City of New York* [*Allen Street*], 256 id. 236.) It would appear that one of the underlying reasons for awarding damages for trade fixtures and distinguishing them from personal property is that they are used in a business and that the city has, by the condemnation, placed itself in the position of a buyer toward a seller. The court will, therefore, allow damages for all trade fixtures which are affixed to the realty and which are used in the business carried on by the claimant upon the premises.

However, the city seeks to defeat certain fixture claims for what they call an alleged non-compliance with the provisions of chapter 387 of the Laws of 1932. This statute was an amendment to section 1445 of the Greater New York Charter, and requires the filing of a verified claim " with an inventory or itemized statement of the fixtures," for which damages are now claimed. It is true that the purpose of this statute was to prevent surprise and the elimination of hardship on the part of the city in defending itself against unjust claims. In considering this statute we must not only bear in mind its purpose, but we also must view the rights of the claimant as guaranteed to him by the Constitutions of the State of New York and of the United States. Both require just compensation to be paid to any private individual from whom the State or city takes property by condemnation.

The statute itself is intended to be a means of procedure or as stating what pleading the claimant must file in order to apprise the city of his claim. The trouble with a statute is that it may work a greater hardship in some cases in its full operation than it relieves. It surely cannot be made the instrument to violate the spirit of these constitutional provisions of just compensation in condemnation cases. It would seem that the notice of claim is in the nature of a pleading setting forth the extent of the claim thus made by the claimant. Pleadings are always subject to amendment. The discretion of the Supreme Court to correct mistakes, not jurisdictional, may not be taken away, at least until the Legislature specifically so states in the law itself. This

court should allow the correction of mistakes in such a paper. (*People ex rel. Durham Realty Corp.* v. *Cantor*, 234 N. Y. 507, revg. 201 App. Div. 834.) However, when a claimant in condemnation abandons a claim by not filing any notice of claim, no amendment should be allowed. He has thus placed himself in a position where he waives any claim, and the city is justified in acting upon the assumption that no claim will be filed. It is also true that where a claimant seeks to alter the claim by substituting an entirely different claim, the court, in the exercise of its discretion, should not allow any such substitution upon the trial. It should be observed that there appears to be no affirmative statement in this statute prohibiting the considering of claims which are not filed within the specified time for the filing thereof. Nor is there any penalty prescribed for a failure so to present a claim. (See *Mark* v. *State*, 97 N. Y. 572; *Benedict* v. *State*, 120 id. 228; *Yaw* v. *State*, 127 id. 190.) A party has a right to be heard in defense of his property rights. (*Londoner* v. *Denver*, 210 U. S. 373; *Appleton* v. *City of Newton*, 178 Mass. 276, 281; 59 N. E. 648.) In the absence of these provisions it is quite clear that the court may, in the exercise of its discretion, allow an amendment to the notice of claim and hear the claim upon the merits. The city further argues that the provisions of this amendment are similar to those of section 261 of the Greater New York Charter. There is no similarity. Under section 261 the claimant must give a notice when he seeks to prosecute a claim for damages. His time is limited and he cannot begin an action for such a claim unless he so informs the city by this notice of claim in writing. In condemnation, the positions of the parties are reversed. The city, itself, institutes the proceeding. It seeks the affirmative action and it seeks it upon a notice published in the *City Record*, which is the only notice that the property owner receives of the commencement of the proceeding. The city, however, often knows that claimants will not appear, and substantial damages are then awarded to unknown owners. It would be manifestly unfair to prohibit a claimant who appears in a proceeding from having just compensation for his property taken because he has filed a claim which is not technically in conformity with the provisions of this recent amendment. This statute is not so to be construed, for such a construction would be violative of both the State and Federal Constitutions. Private property may not be taken for public use except upon making just compensation. Each of the cases where this question of notice has arisen will be taken up separately herein, as the awards for the various parcels are made.

The controversy involving damage parcel 111 relates not to the fee, but to a claim of a lessee to compensation for buildings and fixtures attached to the realty. The claimant asked for a ten-year lease and the dock commissioner said he would grant such a lease only in the form of a five-year lease with privilege to the tenant to renew for five years, and only if the lease contained the " standard forms and provisions." Such a lease is, of course, a ten-year lease. (*Orr* v. *Doubleday, Page & Co.*, 223 N. Y. 334; *Masset* v. *Ruh*, 235 id. 462.) The tenant knew that the city usually leased with a provision that if, after the original five-year portion of the lease had expired, the lease was canceled, the city covenanted to pay for improvements at their amortized value. The tenant took this lease with such a clause. By the terms of the lease, all improvements belonged to the city as soon as they were attached to the land.

At the end of the first five years, there was a formal renewal, which again contained a clause obligating the city to pay for the improvements if the lease was canceled. The city was permitted to cancel during the last four years and it is *res adjudicata* that the city has duly terminated this lease. In both the original lease and in the renewal there was, however, a clause saying that the parties would make an agreement as to what compensation should be paid if the lease were terminated by the lessor for the reasons here existing. In this proceeding the claimant asks, in effect, that the city specifically perform that agreement. This court has already written on this point in Triborough Bridge proceeding, One Hundred and Twenty-second street to One Hundred and Twenty-fifth street, in connection with damage parcel 10 in that proceeding.* The ruling was and is that a court of condemnation has no such jurisdiction. In the case involving damage parcel 10, Triborough Bridge, there was no claim for specific performance. That claim was based on waiver, which is also relied upon in this proceeding. If the city is compelled to execute the agreement fixing compensation, that agreement will date back to February 1, 1928, the date when the lease executed in July, 1928, began to run. Assuming, without deciding, that claimant has a claim under that contract, he would have no claim in condemnation. It involves only a question of damages arising out of contract at the date of termination of the lease. That claim exists irrespective of condemnation. This court is limited by the provisions of the condemnation statute and the order of condemnation. It may not go beyond their provisions for its jurisdiction. Such jurisdiction does not extend to personal property

---

* *Matter of City of New York* (*Triborough Bridge*) (159 Misc. 617).

damages for breach of contract or actions for reformation of written contracts. This court is not the proper forum for this claim. (*Matter of Culver Contracting Corp.* v. *Humphrey,* 268 N. Y. 26, 34; *Matter of Poughkeepsie Bridge Co.,* 108 id. 483; *Matter of Willcox,* 213 id. 218.)

The fixture claims are disposed of in the following manner: The Metropolitan Steam Laundry is allowed $48,500. The Kaywell Sanitary Wiping Company is allowed $17,000. Trinor Corporation is allowed $56,000. Modern Coat and Apron Supply Company is allowed $1,200. The claim of Federal Linen Supply and Steam Laundry is disallowed. The title and the actions of the claimants conclusively establish that as to them these articles were personal property, and not trade fixtures. A claim is made by the Cheseborough Estates for certain fixtures that were the property of the tenant, the Washburn Wire Company, and located on damage parcels 27, 28, 29 and 31. These were trade fixtures actually in use by the tenant in the business conducted by it upon the premises. The tenant has discontinued the business upon these premises and left behind certain of the property which it does not want. The owner claims damages for the value of these fixtures which were part of that business. It claims that it should be compensated for them, although it never owned them. Assuming that they have become attached to the realty, it also appears from the evidence that they do not enhance the value of the same. In fact, the evidence clearly negatives that claim; therefore, no award may be made for them as trade fixtures or in any way increasing the value of the realty.

A claim has been filed by the Frank H. Wood Coal Company. Many of the structures claimed are upon city property. No allowance may be made for anything that has been so placed upon city property. The claimant is allowed the sum of $15,000.

The claim of Burns Bros. for fixtures on damage parcel 45 is disallowed. The action of the claimant was an abandonment. Moreover, the property was upon land of the city of New York. If the claimant has any claim, it is not in this court.

The claim of Central Coal Company for fixtures is disallowed. If there is any claim here, it is for breach of contract. This is not the proper forum to litigate such a claim.

As to damage parcels 115 to 119, the tenant is entitled to no award for the value of the lease. That instrument expressly provides that the tenant is entitled to damage to the structures. Most of these are on city property. Damages to improvements not so situated are fixed at $875. Ordinarily the owner would be entitled to damages representing the fair value of the physical

bulkhead. Moreover, the lease transfers this right to the tenant. The award for the value of the physical bulkhead is fixed at $21,000.

The leasehold claim by the Harlem Market, Ltd., is disallowed. The tenant is now paying the full value of the lease in rent.

Damage parcels 1 and 2. Unit value over all before taking, including riparian rights, is fixed at three dollars and forty cents per square foot. Unit value over all after taking is fixed at two dollars and seventy cents per square foot. Let the direct and consequential damages be computed as follows: Direct damage, 18,895 square feet taken at three dollars and forty cents per square foot. Consequential damage, 33,692 square feet remaining fixed at seventy cents per square foot.

Damage parcel 4A. There are riparian rights over damage parcel 4 which must be paid to owner of adjoining property which has been denominated 4A on the damage map. Those riparian rights are fixed at the rate of forty cents per square foot.

Damage parcels 7, 7A, 8, 11, 12, 15, 16, 19 and 20. Unit value over all, including riparian rights, is fixed at three dollars and forty cents per square foot.

Damage parcels 24, 25 and 26A new. Included in this appraisal is the westerly portion of damage parcel 26, which is the property west of the westerly line on the map of the Randel property (Bridges map of 1826). Unit value over all, including riparian rights, is fixed at three dollars and sixty cents per square foot. Improvements (buildings) on damage parcels 24, 25, 26 and 26A are fixed at $29,500.

Damage parcels 27, 28, 29 and 31. The land unit, which includes bulkhead rights, for upland is $13,500 per lot. Land unit under water, which also includes bulkhead rights, is fixed at $5,500 per lot. Improvement, damage for buildings (not for machinery and fixtures), is fixed in the sum of $45,000. Award for physical bulkhead and pier is fixed in the sum of $40,000.

Damage parcel 31A. There is no award for this parcel, and one dollar is awarded to the city of New York.

Damage parcel 38. The unit values as to this parcel have been fixed in Grit Chamber proceeding, decided herewith. Let the values therein stated be applied in the tentative report to the portion of the property acquired in this proceeding.

Damage parcels 45, 46 and 53 are awarded to claimant. Damage parcel 45 is included in the grant from the city and as it does not lie in the bed of any street it was not excepted. Damage parcel 46 is inshore of the high-water mark and belongs to claimant under its chain of title. Damage parcels 50 and 51 lie within the high-water mark, but nobody has proved title. Those parcels,

damage parcels 50 and 51, are awarded to unknown owners. Damage parcels 47, 48, 49, 52, 54 and 55, are awarded to the city and the damage for each is fixed in the sum of one dollar. (*Burns Bros.* v. *City of New York, supra.*) There is a controversy over damage parcel 53. It is a small triangle lying west of the westerly side of Exterior street and east of the easterly side of Avenue A. It, therefore, is not excepted in the grant. A triangle five feet by twenty-eight feet set in the middle of land of another has no value except the nuisance value of the right-of-way to reach it. But that is not the situation here. This parcel has access on three streets. The unit value over all is four dollars and fifty cents. From what the evidence discloses, it would appear damage parcels 50 and 51 have similar bulkhead rights to damage parcels 45 and 46. Instead of 205 feet of bulkhead rights, only 103 feet of bulkhead rights is awarded to damage parcels 45 and 46. Balance of bulkhead rights must be awarded to damage parcels 50 and 51 and is fixed at $225 a linear foot. The unit value over all for damage parcels 45, 46, 50 and 51 is fixed at three dollars and forty cents per square foot. There is no damage awarded for improvements on damage parcels 50 and 51. Damages for the improvements on damage parcels 45 and 46 are fixed in the sum of $1,250. For the 103 feet of physical bulkhead on damage parcels 50 and 51 there is awarded $2,500, and also as to damage parcels 45 and 46 there is awarded $2,500 for the balance of the physical bulkhead. Damages for fixtures not on city property and included in these two parcels are allowed in the sum of $300.

Damage parcels 57, 58A, 60, 61. The unit value over all is fixed at three dollars and sixty cents per square foot, with eighty cents per square foot consequential damage, taking in area of 20,000 square feet, and twenty cents per square foot for the balance of claimant's property. The bulkhead rights for 205 feet is fixed at $225 per linear foot. The damage awarded for the physical bulkhead is fixed at $2,500.

The court awards damage parcels 57, 60 and 61 to claimant because they were upland. The laying out of Avenue A and Exterior street did not in any wise interfere with the title. There never was any transfer of title of any part of damage parcels 57, 60 and 61 to the city. Damage parcel 58A is awarded to the claimant by reason of the city's grant. As it does not lie in the bed of any street it was not excepted from the grant. The improvements on the claimant's property are fixed at $13,500. Damage parcel 58 is awarded to the city. It lies in the bed of Avenue A. It was excepted in the grant. The discontinuance of the street in 1875 did not add it to the grant. There is no adverse posses-

sion in this instance. The court does not decide whether the statute of 1873 would have interrupted the running of the time. This is immaterial here for the earliest date the time could have started to run is 1875. For the same reason the court awards damage parcels 59 and 62 to the city. They are in the bed of Exterior street. The award is fixed in the sum of one dollar.

Damage parcels 67, 68, 69, 70, 73 and 77 are awarded to the claimant.

The claimant claims title to damage parcels 71, 72 and 75. The first contention is based on adverse possession for fifty-two years before the taking in 1935. The time of adverse possession, therefore, started to run in 1883. There are other reasons why adverse possession has not ripened into title, all of which have been sufficiently discussed in this memorandum. No adverse possession as to land under water of the city can be established if the time started to run after 1873. (*Matter of City of New York*, 228 N. Y. 140.)

Claimant also says that since Exterior street can never be used as a street in so far as damage parcel 75 is concerned, the exception ceased to be valid in 1890 and claimant owns damage parcel 75 under the terms of the grant. That claim is based on facts which must be stated. The grants (1870 and 1871) excepted Exterior street as laid down on the map. In 1890 the Secretary of War established a bulkhead line twenty feet west of the east line of Exterior street. No fill can be made offshore of that bulkhead line. Therefore, the claimant's contention is that because the exception was the bed of a street, and the east twenty feet can never be the bed of a street, the east twenty feet is not excepted. But the exception has nothing to do with a street. A certain piece of land was excepted from the grant. It just happens that a complete description of that land can be given by saying it is a certain piece of land laid down on a map as a street. (*Matter of Commissioner of Public Works*, 135 App. Div. 561; *Las-Daub Realty Corp.* v. *Fain*, 214 id. 13.) In *N. Y. Cent. & H. R. R. R. Co.* v. *City of Buffalo* (200 N. Y. 113, at p. 119) the city of Buffalo condemned land for a street and did not open or use the street. The condemnation vested a portion of plaintiff's land in the city of Buffalo. It was held that the non-use of a street was immaterial and the city held title to the land condemned. Damage parcels 71, 72 and 75 are awarded to the city.

The unit value over all for damage parcels 67 and 68 is three dollars per square foot. The unit value over all for damage parcels 69 and 70 is three dollars per square foot. The value of the bulkhead rights is fixed at the rate of $225 per linear foot.

The unit value over all for damage parcels 73 and 77 is two dollars and twenty cents per square foot. The improvements are valued as follows: The garage, $28,500, the coal pockets, $10,875; all other improvements, $4,650; gasoline tanks and pumps in the garage, $250; the physical bulkhead, $7,500.

Damage parcels 78, 79, 80, 81, 82, 83 and 84 are awarded to the claimant. The unit value of these parcels is two dollars and sixty cents per square foot plus ten per cent plottage.

Damage parcel 87 is awarded to claimant. Damage parcel 88 is in dispute. The reason depends on facts which must be stated. In 1852 Isaac Adriance and his wife conveyed to Lewis A. Sayre the premises in question, limiting them on the east by *low-water* mark. Adriance had title only as far as high-water mark, but as the description includes everything that he owned, title to high-water mark passed to Sayre. A week later Sayre conveyed to Nathan Benjamin, limiting the land on the east by the Harlem river (which means high water) as laid down on Randel's map No. ——. There is a blank where the number of the map should be. There are two Randel maps — one 1818, the other 1826, but the latter does not take in this locus. The high-water line of the 1818 map is the easterly edge of damage parcel 88. The nearest map line of high water is 1859, and it corresponds on the evidence with the 1818 line. Therefore, claimant is awarded damage parcel 88, for he owned to the high-water line as shown on the Randel map of 1818. There are no riparian rights in these parcels for the reason that the shore has been improved by the city for the purposes of navigation and commerce. The unit value over all for damage parcels 87 and 88 is three dollars per square foot.

Unit value over all as to damage parcels 92, 93 and 94 is three dollars per square foot. For improvements the award is fixed at $5,500. The award for damage parcel 95A is fixed in the sum of $1,137. Title to damage parcel 98 is in the claimant. The unit over all is fixed at three dollars and fifty cents per square foot. Bulkhead rights per 224 feet is fixed at $225 per linear foot. Consequential damages to the land is fixed at one dollar per square foot for 13,966 square feet. Value of physical bulkhead is fixed at $45,000. Value of improvements, $2,000.

Title to damage parcel 99 is in the city of New York, and the award is fixed in the sum of one dollar.

Title to damage parcel 108 is in the claimant. Unit of value over all for damage parcel 108 is three dollars and twenty cents per square foot. Bulkhead rights are fixed at $225 per linear foot. Consequential damages are fixed at the rate of sixty cents per square foot for the first 100 feet to the west of the taking and for the

balance of the property of claimant at eighty cents per square foot. Damages for buildings are fixed at $16,000. Physical bulkhead is valued at $68,000.

Title to damage parcels 109 and 110 is in the city of New York.

Damage parcels 115, 116, 117 are awarded to the claimant. Unit of value over all is fixed at three dollars and twenty cents per square foot. Bulkhead rights of $260\frac{1}{4}$ feet are fixed at $225 a linear foot. Improvements are valued at $910.

Title to damage parcels 118 and 119 is in the city of New York. The claims for the value of the bulkhead have already been passed upon in this memorandum.

The award for damage parcel 120 is made to an unknown owner and the unit value over all is fixed at three dollars and fifty cents per square foot.

In damage parcels 3, 4, 5, 6, 14, 18, 22, 23, 30, 31A, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 56, 63, 66, 74, 75A, 76, 85, 86, 89, 90, 91, 96, 97, 100, 102, 103, 104, 105, 106, 107, 111, 112, 113, 114, 118, 119, 121, 122, no awards have been made, as the court has been informed that the city has acquired these properties. Proof of value may be given on objections to tentative decree.

Let the above computations be made and the corporation counsel is directed to prepare the tentative decree accordingly.